Matthew K. Bishop (Mont. Bar No. 9968)
Western Environmental Law Center
103 Reeder's Alley
Helena, Montana 59601
Ph: (406)-324-8011
bishop@westernlaw.org

John R. Mellgren, *admitted pro hac vice*
Western Environmental Law Center
120 Shelton McMurphey Blvd., Ste. 340
Eugene, OR 97401
Ph: (541) 359-0990
mellgren@westernlaw.org

*Counsel for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| FRIENDS OF THE WILD SWAN, et al., | CV-20-173-M-DWM |
| Plaintiffs, | MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT |
| vs. | |
| DEB HAALAND, et al., | |
| Federal-Defendants. | |

TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ii

LIST OF ATTACHMENTS ........................................................................ v

BACKGROUND ........................................................................ 3

A.   The Endangered Species Act ........................................................ 3

B.   The listing of lynx and its recovery plan history ............................ 4

C.   The 2017 lynx assessment ............................................................. 9

D.   The five-year status review and section 4(f)(1) decision ............... 12

STANDARD OF REVIEW ........................................................................ 14

ARGUMENT ........................................................................ 15

A.   A recommendation to delist is not a valid reason to forgo
     recovery planning ........................................................................ 15

B.   The Service's recommendation to delist is premature ................. 18

C.   The Service's recommendation to delist is premised on lynx
     survival, not recovery ................................................................. 20

D.   The Service's recommendation to delist is premised on the
     wrong time-frame ........................................................................ 22

E.   The Service's recommendation to delist lynx conflicts with
     the best available science ........................................................... 31

CONCLUSION ........................................................................ 36

CERTIFICATE OF COMPLIANCE ....................................................... 37

TABLE OF AUTHORITIES

CASES:

*Alaska Oil & Gas Ass'n v. Jewell,*
   815 F. 3d 544 (9th Cir. 2016)........................................................ 21, 24

*Alaska Oil and Gas Ass'n v. Pritzker,*
   840 F.3d 671 (9th Cir. 2016)............................................. 23, 24, 30, 31

*Alaska Oil and Gas Assoc. v. Ross,*
   2018 WL 821866 (9th Cir. 2018)............................................. 24, 25, 29

*Ctr. for Biological Diversity v. Haaland,*
   998 F.3d 1061 (9th Cir. 2021)...................................................... 29, 31

*Ctr. for Biological Diversity v. Jewell,*
   2018 WL 1586651 (D. Ariz. 2018)....................................................... 21

*Ctr. for Biological Diversity v. Kempthorne,*
   607 F. Supp. 2d 1078 (D. Ariz. 2009)............................................ 15, 16

*Citizens of Overton Park v. Volpe,*
   401 U.S. 402 (1971)........................................................................ 14

*Crow Indian Tribe v. United States,*
   965 F. 3d 662 (9th Cir. 2020)............................................................ 23

*Defs. of Wildlife v. Jewell,*
   176 F. Supp. 3d 975 (D. Mont. 2016)........................................... 14, 23

*Defs. of Wildlife v. Norton,*
   258 F.3d 1136 (9th Cir. 2001)........................................................... 20

*Fla. Power & Light Co. v. Lorion,*
   470 U.S. 729 (1985)........................................................................ 15

*Friends of the Wild Swan v. Ashe*,
18 F. Supp. 3d 1077 (D. Mont. 2014)..........................................1, 8, 17

*Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*,
378 F.3d 1059 (9th Cir. 2004)...........................................3, 21

*Greater Yellowstone Coal. v. Servheen*,
665 F. 3d 1015 (9th Cir. 2011)...........................................35

*Humane Society v. Locke*,
626 F.3d 1040 (9th Cir. 2010)...........................................14

*Kern Cnty. Farm Bureau v. Allen*,
450 F. 3d 1072 (9th Cir. 2006)...........................................31

*League of Wilderness Defenders v. Forest Service*,
549 F.3d 1211 (9th Cir. 2008)...........................................14

*Motor Vehicle Mfrs. Ass'n  v. State Farm Mut. Auto. Ins.*,
463 U.S. 29 (1983)...........................................36

*Native Ecosystems Council v. Dombeck*,
304 F.3d 886 (9th Cir. 2002)...........................................14

STATUTES:

5 U.S.C. § 701...........................................14

5 U.S.C. § 706(2)(A)...........................................14

16 U.S.C. § 1531(c)...........................................3

16 U.S.C. § 1532(20)...........................................3, 23

16 U.S.C. §§ 1533(a)(1)(A)–(E)...........................................3

16 U.S.C. § 1533(b)...........................................3

16 U.S.C. § 1533(c)(2) ...................................................................... 19

16 U.S.C. § 1533(f) ............................................................... 1, 3, 15

16 U.S.C. § 1533(f)(1)(B) .................................................................. 4

REGULATIONS:

50 C.F.R. § 402.02 ........................................................................ 21

50 C.F.R. § 424.11(d) ............................................................... 4, 19

50 C.F.R. § 424.11(d)(2) .................................................................. 4

FEDERAL REGISTER:

65 Fed. Reg. 16,052 (March 24, 2000) ............................................ 6

79 Fed. Reg. 54,782 (September 12, 2014) ..................................... 28

84 Fed. Reg. 45,020 (August 27, 2019) ..................................... 23, 30

ATTACHMENTS[1]

Declaration of Arlene Montgomery

Declaration of Sarah McMillan

Declaration of Sarah Johnson

Exhibit A:  U.S. Fish and Wildlife Service's guide, entitled "Delisting a Species, Section 4 of the Endangered Species Act."

Exhibit B: U.S. Department of the Interior, Office of the Solicitor, Memorandum M-37021: The Meaning of "Foreseeable Future" in Section 3(2) of the Endangered Species Act (January 16, 2009).

---

[1] These attachments are properly before this Court. The three declarations are submitted for the sole purpose of demonstrating Plaintiffs satisfy the minimum requirements for Article III standing. Exhibits A and B are true and correct copies of agency documents that are readily available on-line and subject to judicial notice.

Since the Canada lynx was listed as a threatened species in the contiguous United States in March, 2000, the U.S. Fish and Wildlife Service (the Service) has effectively avoided preparing a recovery plan for the species as required by section 4(f) of the Endangered Species Act (ESA), 16 U.S.C. § 1533(f). Various impediments purportedly got in the way, including work on critical habitat, status reviews, and other listing priorities. Even after the Service told this Court in *Friends of the Wild Swan v. Ashe*, 18 F. Supp. 3d 1077 (D. Mont. 2014), that it could prepare a recovery plan by January 2018, the Service continued to postpone work on recovery planning. Throughout this twenty-year period, however, the Service never questioned the need for and value of a recovery plan for lynx conservation.

In December 2017, however – one month before the January 2018 deadline imposed by *Friends of the Wild Swan* was set to expire – the Service changed course and said a recovery plan was no longer necessary because it recommended lynx be delisted due to recovery. The Service said it would therefore focus on delisting, not recovery planning.

In this case, Plaintiffs challenge this December 2017 decision. The Service does not have the authority to forgo recovery planning based on

1

an early (and unsupported) recommendation to delist lynx at some future date. Nothing in the ESA, regulations, or the Service's own guidance provides for this circumstance. The Service's decision is also premature: none of the recovery objectives from the 2005 recovery outline have been met and the agency has yet to complete the ESA's delisting process. The Service's decision is also premised solely on a finding that some lynx will likely survive in some areas over the short-term, until 2050. As such, there is no underlying "recovery" finding to support delisting and no evaluation of threats, including climate change threats, into the foreseeable future.

The best available science, including *every* scientific paper on climate change threats, reveals lynx in the contiguous United States are in trouble. Populations will continue to decline and lynx will likely be extirpated from most areas by the end of this century, perhaps sooner. No evidence suggests otherwise. There is thus no scientific support for the Service's recommendation to delist lynx "due to recovery," and by extension, no scientific or legal justification to forgo recovery planning for lynx.

# BACKGROUND[2]

## A.     The Endangered Species Act.

Species qualify for listing as "threatened" under the ESA if they are "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20). This determination requires careful consideration and evaluation of the best available science, *id.* at § 1533(b), and an analysis of the ESA's five threat factors. *Id.* at §§ 1533(a)(1)(A)–(E).

Once a species is listed, the Service is charged with ensuring the survival and conservation (recovery) of the species. 16 U.S.C. § 1531(c). These are two different though complementary goals of the ESA. *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1070 (9th Cir. 2004), *amended*, 387 F.3d 968 (9th Cir. 2004). To achieve these goals, section 4(f) of the ESA directs the Service to prepare recovery plan for all listed species unless the Service determines such a plan will not promote the conservation of the species. 16 U.S.C. § 1533(f).

---

[2] This background section provides only a short summary. Please see Plaintiffs' Statement of Undisputed Facts (Facts) for more information.

Recovery plans are roadmaps that lay out where the Service needs to go for species recovery and how best to get there. FWS-006772. Recovery plans are thus considered one of the "most important tools" for species conservation under the ESA. *Id.* While recovery plans are guidance documents, the ESA directs that all plans contain certain provisions, including objective, measureable delisting criteria, conservation actions designed to meet the criteria, and estimates for time and costs required. 16 U.S.C. § 1533(f)(1)(B).

Under the ESA, a species may be removed or "delisted" if the best available science reveals it is recovered. 50 C.F.R. § 424.11(d). A species is recovered when the best available science reveals it has met the recovery plan's delisting criteria and objectives and all existing and future threats are alleviated such that it no longer meets the definition of a threatened species. *Id.* at § 424.11(d)(2); *see also* Exhibit A at 1 (delisting process).

**B.    The listing of lynx and its recovery plan history.**

The lynx is a snow-obligate species; its survival and distribution is influenced entirely by snowy conditions. FWS-004222. Lynx are generally restricted to areas that receive "deep, powdery, and persistent

4

snow" which gives lynx, with their very large feet and proportionally long-limbs, a competitive advantage over other predators. FWS-004222; FWS-000103.



FWS-004210. Lynx are habitat specialists that depend largely on dense, multi-story forest stands with dense horizontal cover. FWS-000121-124. Lynx are also prey specialists, relying almost exclusively on snowshoe hare. FWS-004222.

In the contiguous United States, lynx historically occupied forested areas with persistent snow conditions as revealed by the following map:



**Figure 8.17**—Spatial distribution of lynx occurrence data from 1842 to 1998 (Table 8.1).

FWS-020543. In March 2000, the Service determined lynx in the contiguous United States qualified as a "threatened" distinct population segment under the ESA. 65 Fed. Reg. 16,052 (March 24, 2000). The largest threat identified at the time of listing was the lack of guidance for lynx management on National Forest and BLM lands, *see id.*, but since that time climate change has emerged as the most significant threat to the species. Facts ¶¶ 78-126.

In September 2005 the Service prepared a recovery outline to provide interim guidance on recovery efforts for lynx until a final recovery plan could be prepared. FWS-031954. The recovery outline

recognizes *seven* core areas for lynx: (1) Maine, (2) Minnesota, (3) Montana, (4) Washington's Kettle Range/Wedge, (5) Washington's North Cascades, (6) the Greater Yellowstone Area, and (7) the Colorado. FWS-031957-58.



FWS-031974. These seven core areas were deemed central to recovery efforts for lynx in the contiguous United States because they have the "strongest long-term evidence of persistence of lynx populations" and are areas with "verified records of lynx occurrence over time and recent evidence of reproduction." FWS-0031956-57; *see also* Facts ¶¶ 18-36

(discussing contents of recovery outline).

In the recovery outline, the Service said it would initiate recovery planning for lynx in early 2007, after completing work on critical habitat. FWS-031967. The Service anticipated completing the process by June 2009. FWS-031968. Yet, following release of the 2005 recovery outline, no progress on recovery planning was made.

In response, organizations challenged the Service's failure to prepare a recovery plan for lynx as required by section 4(f) of the ESA. *See Friends of the Wild Swan v. Ashe*, 18 F. Supp. 3d 1077 (D. Mont. 2014). In *Friends of the Wild Swan*, this Court gave the Service roughly four years – until January 15, 2018 – to prepare a recovery plan or make a determination under section 4(f)(1) of the ESA that such a plan would not promote the conservation of the species. Facts ¶¶ 51-52. This Court also ordered the Service to submit semiannual reports on its progress. Facts ¶¶ 52-53.

In December 2014, the Service said it had completed critical habitat for lynx and would shift its focus to recovery planning. Facts ¶ 54. The Service also said it now had guidance for completing a recovery plan and had outlined various responsibilities, timetables, and budgets

8

for doing so. *Id.* In July 2015, the Service said it was planning on preparing a Species Status Assessment for lynx (lynx assessment) and had assigned a core team of biologists to engage in that process. Facts ¶ 55. This core team would be charged with completing the lynx assessment and then preparing a "subsequent recovery plan." *Id.*

## C.   The 2017 lynx assessment.

From 2016-2107, the Service put together an expert workshop on lynx science and threats and utilized this information and other scientific papers to prepare a lynx assessment. Facts ¶¶ 56-65.

The lynx assessment evaluated the current conditions (as of 2016) and possible future conditions for lynx in the seven core areas, minus Washington's Kettle Range/Wedge area which no longer supported a resident lynx population. Facts ¶¶ 59-61. The six remaining core areas evaluated in the lynx assessment included: Maine, Minnesota, Montana, Washington's North Cascades, the Greater Yellowstone Area, and Colorado. Facts ¶ 61.



*Id.* Within these six core areas, the lynx assessment described the ecological requirements and population dynamics of the species, evaluated the current estimated condition of the lynx population, and attempted assess the future viability of lynx in the near term (2025), mid-term (2050) and long-term (2100). Facts ¶ 63.

The lynx assessment found that while lynx were likely to persist (survive) in most of the core areas in the short-term (over the next few years or decades), over the long-term the population in all six of the seven remaining core areas was in trouble, already experiencing range contraction, and was on a disturbing downward population trajectory

10

due to likely climate change threats. Facts ¶¶ 114-126. The most likely

projections for lynx in *all six* remaining core areas were displayed in the

lynx assessment's six graphs (consolidated here):



Facts ¶ 125.

The Service found that lynx are "at increasing risk of extirpation

[in the contiguous United States] through the end of this century."

FWS-004430; *see also* FWS-004221 (same). Only one of the six core

areas occupied by lynx (Montana) is likely to remain during this time

period. FWS-004429. "The experts we consulted projected that all other

[core areas] have a 50 percent or greater probability of functional extirpation (i.e., no longer capable of supporting resident lynx populations) by the end of this century." *Id*. The Service noted that in the future, lynx habitats "are likely to be smaller and more fragmented, and [core areas] that are already relatively isolated from other lynx populations are likely to become even more isolated in the future." *Id*.

For these reasons, the lynx assessment concluded that the lynx's resiliency will be "substantially diminished" because of reduced population sizes and distributions throughout the contiguous United States, with resulting extirpation of resident populations from most of the core areas "more likely than not by the end of the century." FWS-004430. This puts the lynx "at increasing risk of extirpation through the end of this century." *Id*. Dr. John Squires – one of the leading lynx biologists who peer reviewed the lynx assessment – agreed with this conclusion. FWS-029659.

## D.   The five-year status review and section 4(f)(1) decision.

In November 2017, and following publication of the lynx assessment, the Service issued a five-year status review. FWS-008111. The status review "synthesizes" the lynx assessments' findings and but

then interpreted these findings to conclude that lynx are actually doing well in the contiguous United States and likely no longer "meet the definition of a threatened species." FWS-008116. The Service said the risk of extinction for lynx is "sufficiently low" such that lynx no longer qualify as a threatened species. FWS-008116. The Service acknowledged it had not met the lynx's recovery objectives, but insisted that such objectives were "not necessary" because it already determined lynx were no longer threatened. FWS-008117. The Service therefore recommended delisting lynx "due to recovery" and said it would proceed with a proposed delisting rule for lynx. *Id*.

In December 2017, the Service determined under section 4(f)(1) of the ESA that preparing a lynx recovery plan would no longer promote the conservation of the species. FWS-008123. The Service based this decision on its findings in the status review that lynx may no longer qualify as a threatened species "due to recovery." FWS-008122. Instead of preparing a recovery plan, the Service said it would prepare a proposed delisting rule. *Id*. This statement was made nearly four years ago.

13

## STANDARD OF REVIEW

ESA claims are reviewed under the Administrative Procedures Act (APA), 5 U.S.C. § 701 *et. seq., Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 891 (9th Cir. 2002). The APA directs courts hold unlawful and set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The APA standard is deferential but courts must still engage in a "thorough, probing, in depth review." *Citizens of Overton Park v. Volpe*, 401 U.S. 402, 415 (1971). Courts must not "rubber stamp" agency decisions that are inconsistent with the law or frustrate congressional policy. *Defs. of Wildlife v. Jewell*, 176 F. Supp. 3d 975, 998 (D. Mont. 2016). Courts must also reject decisions that are based on erroneous interpretations of law, fail to consider an important aspect of the problem, and agency explanations that run counter to evidence in the record. *League of Wilderness Defenders v. Forest Service*, 549 F.3d 1211, 1215 (9th Cir. 2008). There must be a "rational connection" between the facts found and the choice made. *Humane Society v. Locke*, 626 F.3d 1040, 1048 (9th Cir. 2010). If the record does not support the agency decision, it should be vacated and remanded to

14

the agency. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).

## ARGUMENT

The Service's section 4(f)(1) decision to forgo recovery planning based on a recommendation to delist lynx "due to recovery" is arbitrary and violates the ESA for *five* reasons.

### A.   A recommendation to delist is not a valid reason to forgo recovery planning.

First, the Service does not have a valid reason to forgo recovery planning. Section 4(f) of the ESA requires preparation of a recovery plan unless the Service determines such a plan "will not promote the conservation of the species." 16 U.S.C. § 1533(f). This is a narrow exemption. FWS-006785.

As explained by the Service, "very few acceptable justifications" for such an exemption exist and they must be well documented in the administrative record. *Id.*; *see also Center for Biological Diversity v. Kempthorne*, 607 F. Supp. 2d 1078, 1088 (D. Ariz. 2009) (noting same). In fact, only three justifications exist: (1) when delisting is anticipated because the species is presumed extinct or was listed in error; (2) when the species' range occurs entirely in other countries for which the Service has little authority and control; or (3) when "other

15

circumstances" exist "that are not easily foreseen, but in which the species would not benefit from a recovery plan." *Id*. None of these justifications apply here.

Lynx are not extinct and were not listed in error. Nor are lynx a foreign species. The Service says its decision to forgo recovery planning for lynx falls within the third, "other circumstances" category. FWS-008122. But this is incorrect. This exemption only applies to other circumstances "that are not easily foreseen," FWS-006785, and to the extent the Service relies on this exemption, it must carefully document why it applies and why it was unforeseen. *Center for Biological Diversity*, 607 F. Supp. 2d at 1088. The Service did neither here. Nowhere in the record does the Service explain why this other circumstance, i.e., its recommendation to delist lynx based on a recovery finding, was not easily foreseen. Nor could it. Delisting a species due to recovery is the overarching goal and very purpose of the ESA for all listed species, including lynx. There is nothing unforeseen about it.

Further, nothing in the ESA, regulations, or the Service's guidance anticipates or provides for the ability to forgo recovery planning simply because the agency made an early, internal

recommendation to delist a species at some yet-to-be-determined future date. The Service's recovery guidance discusses future delisting as a valid justification but only in two situations (neither of which exists here). FWS-006785.

In fact, in the history of the ESA, the Service has never attempted to forgo recovery planning under these circumstances. As noted in an internal email, the agency has done "very few" of these determinations over the years and to its knowledge "*never* in a situation like we have for lynx." FWS-035114 (emphasis added). Nor could it without running afoul of the ESA and its requirements for delisting. *See infra* section 2.

Further, if allowed to stand, such a justification would set a dangerous precedent by giving the Service's ability to avoid Congressionally mandated and court-ordered obligations, i.e., critical habitat, recovery planning and other obligations under the ESA, solely on the basis of an internal and unsupported recommendation to delist a species at some future and yet-to-be-determined date. This is very circumstance this Court rejected and sought to avoid in *Friends of the Wild Swan. See* 18 F. Supp. 3d at 1080-81.

17

**B.      The Service's recommendation to delist is premature.**

Second, the Service's decision to forgo recovery planning based on a recommendation to delist is premature. The Service's 2005 recovery outline provides the agency's interim strategy, actions, and benchmarks for lynx recovery until a final recovery plan is produced. FWS-031954; *see also* Facts ¶¶ 18-36 (describing recovery outline). But none of the recovery goals or objectives or actions included in the recovery outline have been met, much less implemented.

According to the outline, the recovery of lynx will only be achieved when "conditions have been attained that will allow lynx populations to persist long-term within each of the [seven] identified core areas." FWS-031964. This goal has not been achieved. One of the seven core areas (Washington's Kettle Range) no longer supports a resident population of lynx, two of the seven core areas will likely be lost by 2050, and six of the seven core areas will likely be lost by 2100. Facts ¶¶ 60, 120, 124-125.

The recovery outline's four objectives for lynx include: (1) retaining adequate habitat to support the long-term lynx persistence within the seven core areas; (2) ensuring habitat is available for long-

term persistence of immigration and emigration between each of the seven core areas and populations in Canada; (3) ensuring habitat in secondary areas remains available; and (4) ensuring all threats have been addressed so that lynx populations persist in the long-term, for at least the next 100 years. FWS-031965. None of these recovery objectives have been met. On the contrary, lynx populations are on a downward trajectory, are becoming smaller and more isolated, and are likely headed towards extirpation in the contiguous United States by the end of this century (if not sooner) due to climate change. Facts ¶¶ 78-126. There is no evidence to the contrary. *Id*.

The Service's recommendation to delist is also premature because the agency has yet to initiate and complete the ESA's delisting process. This involves evaluating whether recovery criteria have been met, analyzing whether the ESA's five threats remain throughout all or a significant portion of the lynx's range, publishing a proposed rule to delist for peer and public review, and publishing a final delisting rule in the Federal Register. *See* Exhibit A at 2 (outlining process); 16 U.S.C. § 1533(c)(2) (delisting requirements); 50 C.F.R. 424.11(d) (factors for delisting). None of this has occurred. There is no finding that recovery

objectives have been met and no evaluation of the ESA's five threat factors over all or a significant portion of the lynx's range.

The Service, for example, has never considered or evaluated whether certain portions of the lynx's range in the contiguous United States, i.e., Washington's North Cascades, Colorado or other core areas qualify as "significant portions" and, if so, whether threats to lynx in those portions would warrant listing lynx as required by the ESA. *See Defs. of Wildlife v. Norton*, 258 F.3d 1136, 1141 (9th Cir. 2001) (discussing "significant portion" analysis). The Service also has yet to publish a proposed delisting rule, solicit comment and peer review on the proposed rule, and publish a final rule. And even if the Service managed to publish a proposed delisting rule in the Federal Register, it would likely take over a year to complete and its future would be uncertain (given the lack of any scientific support for delisting), *see infra* section 5.

## C. The Service's recommendation to delist is premised on lynx survival, not recovery.

Third, the Service mistakenly premised its recommendation to delist lynx solely on evidence of lynx survival (as opposed to recovery). The ESA "was enacted not merely to forestall the extinction of species

20

(i.e., promote a species survival), but to allow a species to recover to the point where it may be delisted." *Gifford Pinchot*, 378 F.3d at 1070.

The ESA thus seeks to ensure species recover and not merely survive. *Alaska Oil & Gas Ass'n v. Jewell*, 815 F. 3d 544, 550-551 (9th Cir. 2016). These are two different (though complementary) goals of the ESA and "it is logical and inevitable that a species requires more [habitat] . . . for recovery than is necessary for the species survival . . ." *Gifford Pinchot*, 387 F.3d at 1069, 1070. Under the ESA, the Service must therefore consider the recovery needs of the species, "the long term viability of the species" and not focus "entirely on survival." *Ctr. for Biological Diversity v. Jewell*, 2018 WL 1586651, at *4 (D. Ariz. 2018).

"Recovery means improvement in the status of a listed species to the point at which listing is no longer appropriate under the criteria set out in section 4(a)(1) of the [ESA]." 50 C.F.R. § 402.02. The Service must determine that the status quo has improved and threats have been eliminated or controlled as revealed by population sizes and trends. Exhibit A at 1. "The first milestone in recovery is *halting the decline* of the species. Next is stabilizing the species, followed by increasing

21

numbers and distribution with the ultimate goal of making the species secure in the wild." *Id*. at 2 (emphasis added).

Here, the Service's entire justification for forgoing recovery planning is premised merely on a finding that lynx will persist (survive) in some areas for a short period of time (while the population continues on a downward trajectory). The Service emphasized that some areas that support lynx "are expected to continue to do so" and lynx numbers will likely be "sufficient to sustain species persistence" through mid-century. FWS-008122; *see also* FWS-008114 (noting the same). But such findings only go to survival, not recovery. Indeed, there is no discussion, analysis, or finding related to recovery that would be a prerequisite to any recommendation to delist. There is no determination that lynx numbers and the species' range is improving or that the threats have been or will be alleviated. Nor is there any discussion about halting declining population trends or about meeting recovery objectives or criteria, all of which are prerequisites for a recovery finding. *See* Exh. A.

## D. The Service's recommendation to delist is premised on the wrong time-frame.

Fourth, the Service's recommendation to delist utilizes the wrong time frame for evaluating future threats. Under the ESA, a species is

only recovered if it is no longer threatened, i.e., no longer "likely to become an endangered species within the *foreseeable future* . . ." 16 U.S.C. § 1532 (20) (emphasis added). The focus is on ensuring threats are alleviated into the foreseeable future, not merely preserving existing members. *Defs. of Wildlife v. Jewell*, 176 F. Supp. 3d 975, 999 (D. Mont. 2016) (citation omitted). Focusing solely on the species' ability to survive only the short-term is therefore insufficient. *Crow Indian Tribe v. United States*, 965 F. 3d 662, 679 (9th Cir. 2020). The Service must ensure population trends and threats are addressed over the long-term, into the foreseeable future. *Id.*

The term "foreseeable future" is not defined in the ESA so the Service relies on a 2009 Solicitor's Opinion upheld in *Alaska Oil and Gas Ass'n v. Pritzker*, 840 F.3d 671, 682 (9th Cir. 2016), for guidance. *See* Exhibit B (2009 Opinion).[3] The 2009 Opinion explains the foreseeable future is the timeframe over which the best available science allows the Service to make reliable predictions. *Id.* at 681–682.

---

[3] The Service issued new regulations defining foreseeable future in 2019 (84 Fed. Reg. 45,020), after issuing the decision challenged here. The Service contends the new regulations are consistent with the 2009 Opinion. 84 Fed. Reg. at 45,028.

A reliable prediction is not a statistical requirement, Exhibit B at 1 n. 1, and it need not be quantitative in nature. *Pritzker*, 840 F. 3d at 684. Nor does it require certainty. Exhibit B at 13. Rather, a reliable prediction is one that is grounded in the best available science and "reasonable to depend on it in making decisions." *Id.* at 1 n. 1. These predictions can be in the form of extrapolation of population or threat trends or assessment of how future threats will affect a species. *Id.* at 1. Such predictions are reasonable if they are "grounded in data and logic" as opposed to blind speculation. *Id.* at 8.

To assess future threats, the Service often utilizes predictive models (including climate change models). Exhibit B at 14. The Intergovernmental Panel on Climate Change's (IPCC's) climate models, in particular, which seek to predict climate trends under various emissions scenarios out to 2100, are generally considered the best available science on this topic and have been upheld by the Ninth Circuit as a valid basis for making listing decisions into the foreseeable future. *Pritzker*, 840 F. 3d at 679; *see also Alaska Oil and Gas Assoc. v. Ross*, 2018 WL 821866, *1 (9th Cir. 2018) (noting the same); *Jewell*, 815 F. 3d at 558-59 (upholding agency reliance on climate models). The

24

Service's ability to reasonably rely on such climate modeling is important; it means the agency need not wait until the species' reaches a tipping point or until the agency has specific and often unobtainable quantitative data before listing a species. *Ross*, 2018 WL 821866, at *1.

In this case, to forgo recovery planning and support its recommendation to delist the lynx "due to recovery," FWS-008122, the Service arbitrarily compressed the foreseeable future timeframe for evaluating climate change threats down to 2050 – roughly 29 years from now. FWS-008122. The Service said it chose to do so because "this time horizon gives [it] a higher degree of certainty in reasonably projecting the future condition of [lynx in the contiguous United States]." FWS-008116. This timeframe, however, is a drastic change from the Service's previous approach and falls short of evaluating climate change threats into the foreseeable future, as revealed by the best available science in the lynx assessment which reasonably and reliably project climate impacts to lynx *beyond* 2050.

For example, the Service previously stated that recovery for lynx in the contiguous United States will only be achieved when threats are addressed such that lynx populations can "persist long-term within each

25

of the identified [seven] core areas." FWS-031964. Long term means "at least the next 100 years." FWS-031965. The Service said the same thing in its 2007 Biological Opinion for lynx. FWS-03204. And in the lynx assessment, the Service defended this time frame, noting that it could reliably "forecast potential future conditions for lynx [in the contiguous United States] through year 2100." FWS-004217. It was only beyond 2100 that the "uncertainty regarding potential impacts of climate change and other potential stressors" became too great to preclude a meaningful analysis. *Id*.

This time frame is consistent with the science cited in the lynx assessment. *See, e.g.*, FWS-035119 (discussing climate change science that evaluated changes to the "lynx climate envelope" to the 2090s); FWS-003384 (expert report evaluating lynx persistence out to 2100); Facts ¶¶ 78-107 (discussing papers); FWS-004911-4915 (discussing climate papers). The IPCC's climate models also evaluate threats to the end of this century, *see* FWS-015833-84, FWS-015845-47. In fact, the Service repeatedly relied on the IPCC's climate models to evaluate future climate change threats to lynx, noting that the projected climate changes to the end of this century (and beyond) under all future

scenarios evaluated in the IPCC report are expected to increase

extinction risk for the species, including lynx. FWS-004269; FWS-

015839.

Gonzales (2007) – a seminal paper on climate change impacts

specific to lynx in the contiguous United States and a study routinely

cited and relied by the agency – also projects impacts to the end of this

century. Facts ¶¶ 101-103. Gonzales (2007) predicts lynx habitat in the

contiguous United States will decrease by up to two-thirds by 2100.

FWS-013603. This finding is consistent with other scientific papers that

uniformly project climate change threats out well-beyond 2050 and

generally out to the end of this century. *See* Facts ¶¶ 82-108 (discussing

papers).[4]

This is why the Service routinely utilizes a timeframe beyond

2050 as the appropriate time-frame for evaluating future climate

change threats to lynx and did so in the 2013 lynx strategy, FWS-

---

[4] Galatowitsch (2009) used the 2069 timeframe but still anticipated a
significant decrease in lynx habitat in Minnesota. Facts ¶¶ 95-96.
Carroll (2007) used the 2055 timeframe but projected a 59 percent
decline in the population in Maine by that time. FWS-010718.

00166-167, and 2014 lynx critical habitat rule. *See* 79 Fed. Reg. 54,782, 54,810-54,811, 54,824-54,825 (September 12, 2014).

In the lynx assessment, therefore, the Service did the same thing. The Service evaluated future threats out to 2100 to confidently conclude that lynx populations will decline "through the end of the century" and that lynx may be functionally extirpated from most of the remaining units "by the end of this century." FWS-004219. As explained by the Service, the best available science reveals a negative population level wide trajectory for lynx "continuing to the end of this century" with "no evidence to the contrary." FWS-004430. The Service also noted that the functional extirpation of resident lynx populations from one or more core area would put lynx in the "at increasing risk of extirpation through the end of this century." FWS-004430. Dr. John Squires – a leading lynx biologist – agreed with this concluding statement, noting that the sentiment behind it "was strongly supported" by the research. FWS-029653. The Service's decision, therefore, to shorten the timeframe and only look to 2050 when evaluating future climate change threats for lynx is arbitrary, unsupported by the record, and conflicts with the best available science.

The Service insists there is now too much uncertainty to evaluate future threats beyond 2050, FWS-008122, but besides this general (and vague) statement, no detailed information or reasonable explanation for the change from 2100 to 2050 is provided as required by the APA. *Ctr. for Biological Diversity v. Haaland,* 998 F.3d 1061, 1067 (9th Cir. 2021).

The Service says using the 2050 horizon gives it a "higher degree of certainty in reasonably projecting the future conditions" for lynx. FWS-008116. But this statement implies a high degree of certainty already exists (it just needs to be higher). The Service also notes that future projections beyond 2050 "were complicated by the very high degree of uncertainty *concerning the timing and extent* of various stressors that may affect lynx and hare habitat and snow regimes, especially those related to projected future climate change." FWS-00816 (emphasis added). The only uncertainties, therefore, are over the magnitude and timing of the climate change threat to lynx, not the directionality of the underlying threat itself. This is in important distinction: "Uncertainty regarding the speed and magnitude" of adverse impacts does not invalidate the underlying data or logic or reasonableness of the prediction itself. *Ross*, 2018 WL 821866 at *1. The

ESA does not require an agency "to quantify population losses," or a "projected 'extinction date' or 'extinction threshold' to determine whether a species is 'more likely than not' to become endangered in the foreseeable future." *Pritzker*, 840 F. 3d at 684. Nor does the ESA require the agency "to calculate or otherwise demonstrate the 'magnitude' of a threat to a species' future survival before it may list a species as threatened." *Id.*

The Service recently said it would not "arbitrarily dismiss reliable aspects of various climate change predictions or projections (e.g., directionality) even if other aspects (e.g., rate of change) have greater levels of uncertainty." 84 Fed. Reg. at 45,032. In other words, the Service said it would not dismiss the high confidence in the directionality of the climate trend and its impacts even when there is lower confidence in the rate or ultimate magnitude of the change. *Id.* Yet this is precisely what the Service did in this case.

Notably, with respect to lynx, nothing has really changed in terms of the level of uncertainty. The same uncertainty that existed when the Service issued its decision is the same uncertainty that existed before, when the agency utilized the end of the century time-frame in the 2013

lynx strategy, 2014 lynx critical habitat rule, and lynx assessment. *See, e.g.*, FWS-004427 (noting uncertainty on timing and magnitude but still recognizing threat); FWS-006752 (same); FWS-015833 (IPCC report noting same). "Simply reiterating generic uncertainty that was known at the time of the prior finding does not meet the agency's burden to explain its change in position. This is particularly so here, because even projections with some degree of uncertainty can have value in the ESA-listing process." *Haaland*, 998 F.3d at 1070 (citation omitted).

## E.   The Service's recommendation to delist lynx conflicts with the best available science.

Finally, the Service's recommendation to delist lynx due to recovery conflicts with the ESA's best available science requirement. This standard requires the agency "to consider the best and most reliable scientific and commercial data and to identify the limits of that data when making a listing determination." *Pritzker,* 840 F. 3d at 681. It does not require "ironclad and absolute" science, *id.* at 680, but it does prohibit the Service from disregarding superior scientific evidence or scientific evidence that is in some way better than the evidence it relies on. *Kern Cnty. Farm Bureau v. Allen*, 450 F. 3d 1072, 1080 (9th Cir. 2006).

31

Here, *no* scientific papers support the Service's recommendation to delist lynx due to recovery. On the contrary, all of the applicable scientific studies reveal lynx in the contiguous United States remain threatened by climate change. Lynx populations are likely to become smaller and more isolated and the probability of lynx persistence in each of the six remaining core areas continues to decrease. Facts ¶¶ 123-125. Extirpation of lynx in six of the seven remaining core areas is likely by the end of this century. Facts ¶ 125; FWS-004429-4430; FWS-0008053. There is "no evidence to the contrary." FWS-004430.

In Montana, for example, there is increasing evidence of range contraction and population declines, including in the Garnet Mountains, which is a "major conservation concern." FWS-029652. Additional losses are likely in the foreseeable future due to climate change and increasingly large wildfires in the few remaining areas that still support lynx. Montana is the only core area likely to support lynx by the end of this century, FWS-004429, but it will be significantly smaller and more isolated. Facts ¶¶ 67-70, 98-99, 113, 121, 124.[5] Lynx are also

---

[5] Over a million acres burned in the Seeley Lake area between 2000 and 2013, FWS-003404, and in 2017 two fires burned over 267 square miles of lynx habitat in the same area. FWS-008046. Lynx habitat has also

declining (and resident populations may have been lost altogether) in the Greater Yellowstone Area. FWS-031958. At best, the region is believed to be occupied by very "low numbers" of lynx and the best lynx habitat in Wyoming remains unprotected. Facts ¶ 71. Lynx persistence is unlikely to remain in the area even over the next few decades. FWS-004415.

Lynx are also in trouble in Washington. Facts ¶¶ 72-73, 100, 112, Resident lynx populations likely no longer remain in large portions of the state, including the Kettle Range/Wedge core area, Facts ¶¶ 72-73, and the few remaining areas that still support lynx continue to contract and are under increasingly threat from climate change and increased wildfire activity. Facts ¶ 112; FWS-003405. This is why Washington recently uplisted lynx to state endangered status. *Id.*; FWS-007824. Johnston (2012) projects significant lynx losses in Washington in the foreseeable future and predicts the lynx's distribution and range in Washington is likely to "virtually disappear" by the end of this century. Facts ¶ 100; FWS-016601. This is consistent with the projections in the

---

been reduced by fire on the Lolo and Flathead National Forests. FWS-029657.

lynx assessment. FWS-004410.

In Minnesota, Galatowitsch (2009) reveals lynx habitat is likely to disappear by as early as 2069. Facts ¶¶ 95-96. Other climate modeling for Minnesota suggests that the suitable snow-depth range may be entirely absent by 2095. Facts ¶ 97. The lynx assessment estimates a steady population decline of lynx in Minnesota with extirpation likely well before the end of this century. FWS-004393.

In Colorado, very little is known about current population size and survival rates and the region as recently been hit by large wildfires and large scale bark beetle outbreak. Facts ¶ 75 Lynx in Colorado are likely experiencing a steady downward trend and are likely to be extirpated from the region by the end of this century. FWS-004421.

The only core area where lynx are arguably doing better is in Maine, where population estimates are up. Facts ¶ 77. But the future projections for lynx in Maine are not good. Carroll (2007) estimates that by 2055 lynx populations in the region are likely to decline 59 percent because of climate change. Facts ¶ 94. This is consistent with the lynx assessment's downward population trend for Maine which projects lynx will likely be extirpated from the region by the end of this century.

FWS-004379.

In sum, therefore, the best available science reveals the long-term projections for lynx in the contiguous United States in *all six* remaining lynx units – from Washington to Maine – are dire. Lynx are "at increasing risk of extirpation [in the contiguous United States] through the end of this century." FWS-004430; *see also* FWS-004221 (same). For these reasons, the Service believes that the lynx's resiliency will be "substantially diminished" because of reduced population sizes and distributions throughout the contiguous United States, with resulting extirpation of resident populations from most of the geographic units "more likely than not by the end of the century." FWS-004430. This puts the lynx "at increasing risk of extirpation through the end of this century." *Id.* Dr. John Squires agreed with this conclusion. FWS-029653.

Yet despite this science and these findings, the Service nonetheless chose to forgo recovery planning on the basis of lynx recovery. FWS-008122. There is thus a disconnect in this case between the facts found and the decision made. This is the hallmark of arbitrary agency action. *Greater Yellowstone Coal. v. Servheen*, 665 F. 3d 1015,

35

1023 (9th Cir. 2011); *see also Motor Vehicle Mfrs. Ass'n  v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 57 (1983) (rejecting agency rationale when "every indication in the record points the other way").

## CONCLUSION

For these reasons, Plaintiffs ask that this Court: (1) declare the Service's decision to forgo recovery planning for lynx arbitrary and contrary to the ESA; and (2) direct the Service to prepare final recovery plan for lynx in accordance with the ESA within a reasonable amount of time, not to exceed 12 months from the date of this Court's order (unless a *final* lynx delisting rule is published in the Federal Register before that time).

Respectfully submitted this 24th day of September, 2021.

/s/ Matthew K. Bishop
Matthew K. Bishop

/s/ John Mellgren
John Mellgren

*Counsel for Plaintiffs*

36

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief is proportionally spaced, has a typeface of 14 points or more, and contains less than 6,500 words. I relied on Microsoft Word to obtain the word count.

/s/ Matthew K. Bishop
Matthew K. Bishop